UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CHRISTOPHER SEEHAWER,

Plaintiff,

v.

MCMINNVILLE WATER & LIGHT,

Defendant.

Case No.: 3:16-CV-01682-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Christopher Seehawer ("Seehawer") filed this lawsuit against defendant McMinnville Water & Light ("MWL") under Title VII of the Civil Rights Act ("Title VII"), the Federal Family Medical Leave Act ("FMLA"), and the Americans with Disabilities Act of 1990 ("ADA"). Seehawer alleges discrimination from a hostile work environment due to alleged sexual harassment by coworkers; retaliation for reporting or opposing the harassment; interference,

discrimination, or retaliation for using protected FMLA leave; and failure to engage in the interactive process required upon a reasonable accommodation request and subsequent wrongful termination based on an actual or perceived disability. Currently before the court is MWL's Motion for Summary Judgment. (Def.'s Mot. for Summ. J. ("Motion"), ECF No. 29.) Because no genuine issue of material fact exists as to Seehawer's Title VII and FMLA claims, MWL's motion for summary judgment is granted on those claims. However, because a question of fact exists as to Seehawer's ADA claims, MWL's motion for summary judgment on those claims is denied.[1]

*Background*

Seehawer is a heterosexual male who asserts he is a "qualified individual with a disability, including but not limited to depression and suicidal ideation," which MWL denies. (Compl., ECF No. 1, ¶ 9; Def.'s Reply, ECF 45, at 11.) From 2004 until the termination of his employment in April 2015, Seehawer worked for MWL, a municipal utility provider in McMinnville, Oregon, first as a meter reader and then as a water distributor operator on a water crew. While a member of the water crew, Seehawer performed his duties with other MWL employees, including Bobby Huber ("Huber"), Mike McGanty ("McGanty"), and "leadman" Mark Knutz ("Knutz"). (Compl., ¶ 12, 13.) Seehawer's direct supervisor was Robert Klein ("Klein"), and Seehawer received performance evaluations from both Klein and another supervisor, Terry Olson ("Olson"). (Dep. of Christopher

\ \ \ \ \

---

[1] This court originally entered this ruling as a Findings and Recommendation (ECF No. 52), which District Judge Michael Simon adopted without modification or supplementation (ECF No. 59), after considering plaintiff's objections. Subsequent to that decision, full consent to jurisdiction by magistrate judge was obtained (ECF No. 64), and the court conferred with counsel to set a trial date. (ECF 62, 63.) Accordingly, this court reenters the prior F&R as an Opinion and Order in preparation for trial. The O&O's content is revised only as necessary to reflect this change.

Seehawer ("Seehawer Dep."), ECF No. 38–1, at 74:24 –75:2, 75:3–7).[2] Kem Carr ("Carr") was the general manager of MWL from approximately November 2011 (Dep. of Kem Carr ("Carr Dep."), ECF No. 38–2, 8:8–10, 10:2–4, 15:14–16.)

MWL has written, published policies concerning workplace sexual harassment in its Employee Handbook ("Policy"). (Decl. of Kem Carr, ("Carr Decl."), ECF No. 31, ¶¶ 4, 5.) Seehawer acknowledged that he received, read, and understood the handbook upon his hire in 2004, and the updated Policy in 2010. (*Id.* at ¶¶ 6,7.) The Policy prohibits, among other harassing acts, "[v]erbal harassment . . . , derogatory comments . . . , [and] demeaning or sexually explicit jokes . . . ." (Carr Decl., Ex. 1, at 5.) "[S]tatements are sexual harassment when, *inter alia*, they have the purpose or effect of interfering with the employee's work performance or creating an intimidating, hostile or offensive working environment." (*Id.*) Employees are instructed to report in the following way:

> [C]ontact your supervisor immediately if [y]ou feel you have been the victim of harassment. If you are uncomfortable speaking to your supervisor, please feel free to bring your concerns to the General Manager. Confidential investigations will be conducted promptly. Appropriate corrective actions will be taken upon completion of our investigation. Employees found to be harassing other employees will be immediately and appropriately disciplined, up to and including immediate discharge.

(*Id.* at 6.)

Seehawer testified that his coworkers began harassing him after an August 2013 incident arising from Seehawer's failure to properly secure a vacuum tube onto a vacuum truck with which the water crew was working (the "Vacuum Incident"). (Seehawer Dep., 102:19–103:16; 108:2–17.) Huber was the driver on the job that day, and as he drove away, the tube came off the truck and

---

[2] Depositions are cited to their internal pagination. Documents attached to the deposition transcripts are cited with respect to their exhibit number used in the deposition or declaration.

shattered. (Seehawer Dep., 103:5–10.) Allegedly, immediately following the incident, Huber was angry, and cussing, "got up in [Seehawer's] face" and called him a "dumb ass." (*Id.*; *see also* Carr Decl., Ex. 5, Seehawer's February 12, 2015 letter to management (the "Letter") ("[Huber] approached me and yelled at me . . . and called me a 'f[]ing moron!'").) After an investigation, MWL found both Huber and Seehawer were partially responsible for the Incident. (Carr Decl., ¶ 12.)

According to Seehawer, the Vacuum Incident served as the catalyst for what became a "daily barrage of sexually charged harassment" that questioned his sexual preference for "not living up to the masculine stereotype." (Pl.'s Resp. ("Resp."), ECF No. 37, 2–3.) In November 2013, as Seehawer stood in a trench working on a pipe fitting, Huber, operating a backhoe, backfilled the trench with rocks which fell on Seehawer he bent over the pipe (the "Rock Incident"). (Seehawer Dep., 180:8–14.) Seehawer and MWL disagree as to whether or not Huber acted intentionally. Seehawer stated that at the time, Huber was "looking right at [him]," (*id.*); Huber and Knutz testified that Huber did not see Seehawer, as he was out of view. (Huber Dep., ECF No. 38–3, 23:20–22; Knutz Dep. 33:4–21; Carr Decl., ¶ 13.)

Seehawer testified that Huber and McGanty would consistently taunt, demean, and attack him using inappropriate, demeaning names. (Seehawer Dep., 169:7–14.) Huber would step in front of Seehawer to block him at work and just smile and laugh, or refuse to bring necessary tools for Seehawer when Seehawer was working in a trench. (Letter, 4–5.) Huber and McGanty would say,"Oh look who decided to show up" and "my day is ruined," when Seehawer came into view. *Id.* Seehawer asserts that Knutz would also join them at times. (Letter, at 4 ("[Knutz] would just laugh about it and agree with them.").) Seehawer believes that the names Huber and McGanty called him were sexual or violent in nature, including "cornhole," which Seehawer understood to mean

homosexual. (*Id.* at 169:9–11, 170:17–171:3.) Vulgar language, including use of the term "cornhole," was commonly used in the workplace. (Dep. of Mark Knutz ("Knutz Dep."), 20:15–24, 22:1–6 (stating that the term was thrown around frequently at work "towards somebody doing a stupid act" since around 2012).) Seehawer also states he felt physically threatened by Huber, including an instance when Huber allegedly told Seehawer "I can f[]ing kill you right now," a threat Huber denies making. (Seehawer Dep., 173:12 – 175:5; Huber Dep., 20:24 – 21:1, 25:3–7.)

Seehawer claims he reported the harassment, primarily to Knutz. (Seehawer Dep., 185:8–19.) Seehawer made his first report immediately following the Vacuum Incident, though he does not remember to whom he reported it. (Seehawer Dep., 103:17–25;104:7–13.) Second, he reported to Knutz that Huber allegedly threatened his life. (Seehawer Dep., 175:14–23.) After talking with Huber, according to Seehawer, Knutz determined that Huber had been "joking," and Huber was "never disciplined." (Seehawer Dep., 176:6–18; Resp., at 7.) Third, Seehawer reported Huber's conduct to Knutz after the Rock Incident. (Seehawer Dep. 180:3–16.) Knutz determined that Huber had not seen Seehawer when he began to drop rock into the trench, and therefore took no disciplinary action against Huber. (Huber Dep., 8:12–14.) Seehawer also claims to have made "complaints about coworkers" to Knutz, Klein, and Olson, but does not specify when or how he made those other reports, or what exactly he reported. (Seehawer Dep., 78:5–8.)

MWL contends that although Seehawer complained of mistreatment, and characterized the treatment as "harassment" in the Letter, he never reported that the harassment was sexual in nature. (Carr Decl., ¶¶ 14, 15, 17.) According to MWL, Seehawer did not complain of sexual harassment during regular performance meetings or on any other occasion with Knutz, Klein, Olson, or Carr, but rather reported only that coworkers "treat[ed] him unfairly and us[ed] profane, demeaning names

towards him." (*Id.*) MWL general services manger, Patrick Quin, characterized the conduct between the workers as "childish," like a "wounded chicken" being "picked to death" by a hen. (Dep. of Patrick Quinn, ECF. No. 38–8, 43:14–19, 45:10–22, 47:3–11, 81:18–21.) Seehawer first "ma[de] a complaint about his coworkers" around the time he began his performance improvement plan. (Carr Dep., 31:21–32:3.) Carr "received information" that Seehawer had complained of sexual harassment, but exactly when in time he received that information is unclear. (*Id.* at 30:3–8.)

Seehawer frequently missed, and was tardy to, work. (Seehawer Dep., 111:1–17,112:1–14, Decl. of Joshua Stump ("Stump Decl."), ECF No. 30, Ex. 1.) As detailed in his regular performance evaluations, Klein had warned Seehawer of his poor productivity and noted Seehawer was not willing to perform certain aspects of the job "in hard, dirty work situations." (Stump Decl.; Ex. 4 at 6–10.) MWL became dissatisfied with Seehawer's job performance. (Seehawer Dep., 116:8–14; Stump Decl., Ex. 4 at 6–10.) Due to his frequent absences and increasingly poor performance, Seehawer received a written warning in December 2013, and in July 2014 Seehawer received an unfavorable performance appraisal. (Stump Decl., Ex. 4 at 6–10.) In August, he was placed on a "performance improvement plan" ("PIP") and required to attend weekly meetings with Klein or Olson to "check in" about his job performance. (*Id.* at 11–13, 18.)

Despite a satisfactory performance review on October 1, 2014, later that month, Seehawer began to appear inattentive and "out of it," and he was involved in two avoidable workplace damage incidents. (*Id.* at 18–19.) In December 2014, Seehawer again received a written warning due to poor performance for the period from October to December. (*Id.* at 14–15.) The warning noted that Seehawer was not meeting "some of the expectations" of the PIP, and his performance needed improvement. (*Id.*) Consequently, weekly performance evaluations resumed. Seehawer was warned

that if he failed "to maintain an acceptable level of performance and consistently meet the expectations and performance benchmarks as outlined in the PIP, pay adjustments or other disciplinary action, up to and including termination" could result. (*Id.*)

Seehawer starting taking more time off from work in November 2014, and took FMLA-designated leave for two periods in December 2014. (Carr Dep., Exs. 10, 26, 33.) Seehawer again took FMLA leave in February 2015, following an emergency room visit for an attempted suicide allegedly due to stress from harassment at work. (Seehawer Dep., 218:3 – 2:20:14; Carr Dep., Exs. 12, 26, 33. A MWL memo states Seehawer produced two releases clearing him to return to work "full duty" on Feb. 9, 2015, one from his psychologist, Gregory Cole ("Dr. Cole"), and one from Dr. Eriksen, M.D. (Carr Dep., Ex. 12.) Dr. Cole excused Seehawer from work "for stress related reasons" from February 2–11, 2015, stating Seehawer was "cleared to return to full duty on 2/11/15, as long as he continues to implement treatment suggestions made to him." (Carr Dep., Ex. 33.)[3]

Seehawer began a several-weeks-long outpatient treatment program around February 19, 2015. (Seehawer Dep., at 220:23–222:2; Carr Dep., Ex. 11.) On March 20, 2015, Seehawer submitted to MWL a doctor's note stating that Seehawer could be released back to work on March 30, 2015, to "full duty, with no restrictions." (Carr Dep., Ex. 11, at B–86, *see also* Ex. 33 at B–101 (dated 3/23/15, stating same return date).)

On February 12, 2015, while out on FMLA leave, Seehawer wrote the Letter to MWL

---

[3] Seehawer submitted two different notes from Dr. Cole both dated Feb. 6, 2015, but excusing Seehawer for slightly different time periods. The first states that Seehawer missed work from 2/2/15 to 2/6/15, and was "cleared to return to full duty on Feb. 9, 2015," and the other states that Seehawer was out 2/2/15 to 2/11/15 and was cleared to return on Feb. 11, 2015. Additionally, the second note added a condition to returning to work, "as long as he continues to implement treatment suggestions made to him," which the first not did not contain. (Carr Dep., Ex. 33 at B–99, B–100.)

management outlining the "ongoing harassment" he suffered at the hands of Huber and McGanty, including "name calling and slandering and talking behind [his] back." (Letter, at 3, 6.) Huber and McGanty "started calling [Seehawer] 'corn hole.' They would say it at jobs, [in the] lunchroom, [in the] warehouse, everywhere. . . . Here's a list of what they would say[:] corn hole, fucking corn hole, here comes the corn hole, corn hole alert, now there's a corn hole." (Letter, at 3.) In the Letter, Seehawer claims to have told Knutz, Klein, and Olson "about the issues many times." (*Id.* at 5.) Seehawer also states that Dr. Cole had "come up with a plan of action to make [him] better," suggesting either that Seehawer be transferred or "placed with" coworkers other than Huber or McGanty.[4] (*Id.* at 6.) Seehawer also alleges that he told Klein about Dr. Cole's plan, and Klein said "he would talk with . . . [Carr]" about it. (*Id.* at 7.) According to the Letter, though, Klein "came back" and told Seehawer he could not "accommodate" the suggested options or "change things" around "because of [Seehawer's] issues with" Huber and McGanty. (*Id.*)

Seehawer was still on FMLA leave when MWL received the Letter. (Carr Dep., 46:16–17.) Carr spoke with Klein to see if he had received any previous reports "of this type of harassment" by Seehawer. (Carr Dep., 44:21–24, 46:7–12.) Klein and Olson reviewed and investigated the incidents documented in the Letter; some were substantiated and others were not. (Carr Dep., Ex. 26 at B–95.) The incidents MWL confirmed it addressed with employees, and expectations were discussed. (*Id.*) Management held individual meetings with Knutz, Huber, and McGanty, as well as with the entire water crew as a group, to address the accusations in the Letter, and to "go[] over with the crew that [Carr] didn't want this language to continue." (Carr Dep., 37:19–23, 44:8–16, Ex. 26 at B-95.) Seehawer expressed that he did not want to take part in the meeting with the water crew

---

[4] If Dr. Cole created a written "plan," it is absent from the record.

because he was uncomfortable meeting with them. (Carr Dep., 48:25–49:15, 55:4–14; Seehawer Dep., 98:5–11.) Carr and Klein met with Seehawer separately from the rest of the crew. Seehawer says he told them "what was being said to [him]," such as "douche bag, fucking corn hole, corn hole, here comes the corn hole, look at the corn hole." (Seehawer Dep., 93:14–94:24, 97:17–98:22.)

On April 2, 2015, Seehawer submitted another note from Dr. Cole, who wrote that he had seen Seehawer again "for stress related reasons concerning continuing harassment by coworkers." (Carr Dep., Ex. 33 at B–98.) In this note, Dr. Cole did not excuse Seehawer from work, specify whether Seehawer could work, or state whether he could work with identified restrictions. (*Id.*) After receiving this note, MWL sent Seehawer an FMLA status letter alerting him that he would soon exhaust his FMLA leave, and that MWL would require a release from Dr. Cole "to return to full duty work in [his] position." (*Id.* at Ex. 4.) On April 7, 2015, Dr. Cole indicated that Seehawer was "not currently approved for return to work . . . because of continuing problems managing stress from coworkers, and what [Seehawer] describes as a hostile work environment." (*Id.* at Ex. 33 at B–102.)

MWL sent Seehawer a second FMLA status letter on April 16, 2015 stating, "if [Seehawer did] not return to work, [his] . . . FMLA leave [would] end[] at the end of the day April 23, 2015." (*Id.* at Ex. 5.) Additionally, it stated "there [we]re no open positions" at that time. (*Id.* at 51:13–52:12.) That is, there were no other positions available at MWL into which Seehawer could transfer, but his position on the water crew was "still filled by him." (*Id.*) Seehawer did not return to work, but on April 23, 2015, he appeared onsite to turn in his keys and remove his personal items. (Seehawer Dep., 232:18–233:3, 261:22–25; Carr Dep., Ex. 34.) Because MWL had not received a doctor's note releasing him to full duty, MWL interpreted these events as Seehawer's resignation.

(Carr Dep., Ex. 6.) Seehawer did not see it as such; he claims he was merely "waiting to hear" if MWL would "offer [him] something else" or transfer him to a different position. (Seehawer Dep., 232:18–235:22.) Seehawer filed the instant suit in August 2016. (Compl., ECF No. 1.)

## Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v.*

*Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation omitted).

*Discussion*

I.     Title VII

A.     *Hostile work environment.*

A sexually hostile work environment exists where there is a "pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir. 1998). To prove a hostile work environment claim, a plaintiff must establish first that the workplace was both objectively and subjectively offensive, *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 871-72 (9th Cir. 2001), and second, that the harassment occurred "because of sex." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998). Courts usually address these elements in this sequence to determine the viability of a hostile work environment claim. *See, e.g., Nichols*, 256 F.3d at 871-72 (stating and analyzing the two elements in sequence); *Froby v. Clark County School District*, 669 Fed. Appx. 903, 904-05 (9th Cir. 2016)(addressing the two elements in sequence). Here, the parties' dispute centers primarily on the second element, whether the alleged conduct meets Title VII's "because of sex" requirement. Accordingly, the court addressed this potentially element first.

1.    "Because of sex":  sex-specific element.

To prevail on a claim of a sexually hostile work environment, a plaintiff must prove that (1) harassment occurred; (2) the harassment was of a sexual nature or based on gender; (3) management knew or should have known of the harassment, and (4) management failed to take reasonably prompt, corrective action to address the harassment. *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001).  The Act protects both male and female employees. *Oncale*, 523 U.S. at 78 ("Title VII's prohibition of discrimination 'because of . . . sex' protects men as well as women.") (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983)).  Same-sex harassment also comes within the law's prohibition:  "[N]othing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant . . . are of the same sex." *Oncale,* 523 U.S. at 79; *see also Rene v. MGM Grand Hotel*, 305 F.3d 1061, 1067 (9th Cir. 2002) (observing that *Oncale* interprets Title VII to "forbid[] severe or pervasive same-sex offensive sexual touching").

Analysis of Seehawer's claim begins by determining whether the conduct he describes occurred "because of sex," and his own testimony confirms that it did not.  Seehawer testified that his coworkers' behavior toward him began only after the Vacuum Incident, which occurred because he failed to properly secure a vacuum tube onto a vacuum truck and caused the tube to shatter when Huber drove the truck away.  Seehawer testified the Vacuum Incident was the catalyst for the coworker conduct that is the subject of his harassment claim.

Other evidence in the record further confirms that Seehawer's on-the-job error, not his sex, spawned his coworkers' conduct toward him.  Seehawer began the seven-page Letter this way:  "This all started when I forgot to strap down the suction tube hose on the front of the vac-cov truck."

(Letter, Carr Decl., Ex. 5, at 1.) Nor did Seehawer provide evidence that during the more than nine years between June 2004, when his MWL employment began, and August 2013, when Vacuum Incident occurred, his coworkers directed harassing conduct – sexually charged or otherwise – toward him, or that he ever complained to MWL of such conduct.

In *Froby v. Clark County School District*, 669 Fed. Appx. 903 (9th Cir. 2016), the Ninth Circuit emphasized that harassing conduct must be "because of sex" to constitute a sexually hostile work environment. In *Froby*, the female plaintiff brought a Title VII hostile work environment claim because of the conduct of a male coworker. 669 Fed. Appx. at 904. The court first acknowledged that "[w]hile sexual harassment must be sexual in nature, 'offensive conduct that is not facially sex-specific nonetheless may violate Title VII if there is sufficient circumstantial evidence of qualitative and quantitative differences in the harassment suffered by female and male employees.'" *Froby*, 669 Fed. Appx. at 904, quoting *EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 842 (9th Cir. 2005). The court then observed about the evidence:

> With one exception, the conduct complained of contained no gender-specific element. Rather, Froby asserted more generally that Hendrix was a "bully" who "target[ed] education" and who treated prisoners "badly." The only gender-related conduct was a reference to the mother of his child as a "bitch," but that comment is not, without more, sufficient to allow a jury to infer that Hendrix's overbearing behavior was "because of sex." Title VII is not a "general civility" code for the workplace. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

*Froby*, 669 Fed. Appx. at 904. The Ninth Circuit affirmed summary judgment in favor of the employer.

Here, the only sexually specific behavior Seehawer identified is his co-workers' use of the word "cornhole" in addressing and referring to him, but the context in which its use arose, as was the context in *Froby*, insufficient without more to infer a "because of sex" origin. The other

PAGE 13 - OPINION AND ORDER

examples Seehawer provided – dumping rocks on him while working in a water main ditch, excluding him from conversations, ridiculing his work skills (Letter, Carr Decl., Ex. 5, at 1, 2, 3-4, 5) – did not contain the sexually charged element required to sustain a Title VII hostile work environment claim. The record does not support a reasonable inference that the conduct of which Seehawer complains occurred "because of sex."

> 2.    "Because of sex":  sexual orientation.

Seehawer alleges that his male coworkers subjected him to a hostile work environment, primarily by calling or referring to him as "cornhole," and that he "understood the term cornhole to have the sexual connotation that he was homosexual." (Resp., ECF No. 37, at 14.)  He argues a question of fact exists whether his coworkers used the term to be "sexual in nature." (*Id.*)

"[A]n employee's sexual orientation is irrelevant for purposes of Title VII." *Rene*, 305 F.3d at 1063. "That the harasser is, or may be, motivated by hostility based on sexual orientation is similarly irrelevant . . . .  It is enough that the harasser have engaged in severe or pervasive unwelcome physical conduct of a sexual nature." *Id.* at 1063-64.  That verbal or physical harassment is "because of sex" is not enough, however; under Title VII, the conduct must be " '*discrimina[tion] because of sex.*' " *Oncale*, 523 U.S. at 81 (emphasis in original); *Rene*, 305 F.3d at 1067 (citing *Oncale*).

In *Rene*, the plaintiff's coworkers subjected him to "offensive sexual touching" because of his sex.  The Ninth Circuit observed:

> The physical attacks to which Rene was subjected, which targeted body parts clearly linked to his sexuality, were "because of . . . sex."  Whatever else those attacks may, or may not, have been "because of" has no legal consequence.  "[S]o long as the environment itself is hostile to the plaintiff because of [his] sex, why the harassment was perpetrated (sexual interest? misogyny? personal vendetta? misguided humor? boredom?) is beside the point."

PAGE 14 - OPINION AND ORDER

*Rene*, 305 F.3d at 1066 (citation omitted). Applying the Court's rationale in *Oncale*, the Ninth Circuit observed that Title VII forbids "severe or pervasive offensive sexual touching" and that such touching is "actionable discrimination even in a same-sex workforce." *Rene*, 305 F.3d at 1067.

Seehawer alleges no physical touching, including any touching "which targeted body parts clearly linked to his sexuality," or even any gestures toward him – such as blowing kisses at him as occurred toward the *Rene* plaintiff – that imitated sexual acts. The only physical conduct Seehawer identified came from Huber, who "got up in [Seehawer's] face" at the scene of the Vacuum Incident and who later stepped in front of Seehawer to block him at work. Not only was this conduct not sexual in nature, it did not involve physical contact with Seehawer.

This analysis applies with equal relevance to the verbal conduct Seehawer describes, his coworkers' use of the word "cornhole." As explained previously, Seehawer stated the Vacuum Incident prompted his coworkers' use of that word toward him, and there is no dispute that the Vacuum Incident did not stem from or involve conduct sexual in nature. Seehawer's description of the circumstances in which his coworkers, Huber, McGanty, and others called him "cornhole" – at jobs, in the lunchroom, in the warehouse, "everywhere" (Letter, Carr Decl., Ex. 5, at 3) – does not assert that the word's use occurred in a context that was sexually charged or sexual in nature. Indeed, nothing in Seehawer's seven-page Letter or elsewhere in the record supports a reasonable inference that use of the word "cornhole" met *Oncale's* requirement that the conduct constitute "'*discrimina[tion]* because of sex.'" No fact in the record supports the inference that the co-worker conduct of which Seehawer complains occurred "because of sex."

       3.     "Because of sex": gender stereotyping.

At oral argument Seehawer argued that his coworkers's use of "cornhole" toward him

suggests gender stereotyping drove their behavior. "[F]ailure to conform to [sex] stereotypes" can

be a "criterion of discrimination." *Nichols*, 256 F.3d at 874 (quoting *Price Waterhouse v. Hopkins*,

490 U.S. 228, 272–73 (1989) (O'Connor, J., concurring) (brackets in original) (woman denied

partnership in her accounting firm for being too "macho" and not matching her gender norm

stereotype)).[5] "[A] man can ground a [Title VII sexual harassment] claim on evidence that other men

discriminated against him because he did not meet stereotyped expectations of masculinity." *Id.* at

870 (citing *Price Waterhouse*, 490 U.S. at 250–51).

The record does not support a reasonable inference that Seehawer's coworkers' verbal

conduct occurred because they believed Seehawer "did not act as a man should act," *Nichols*, 256

F.3d at 874, or because he "did not conform to their gender-based stereotypes," *id.*, which prompted

the conduct in *Nichols*. There, the plaintiff's coworkers subjected him

> to a relentless campaign of insults, name-calling. Male co-workers and a supervisor repeatedly referred to Sanchez in Spanish and English as "she" and "her." Male co-workers mocked Sanchez for walking and carrying his serving tray "like a woman," and taunted him in Spanish and English as, among other things, a "faggot" and a "fucking female whore."

*Id.* As the Ninth Circuit observed, plaintiff's coworkers verbally attacked him "for having feminine

mannerisms." *Id.*

Here, nothing in the record shows or suggests that Seehawer's coworkers' verbal conduct

arose from their perception that he did not act as a man should act or because he displayed feminine

mannerisms. None of the comments Seehawer attributes to his coworkers refers to his masculinity

---

[5] Analysis in Title VII stereotyping cases have used "sex" and "gender" interchangeably. "Sex" refers to biological sex, whereas "gender" refers to the social expectations of a person based on that person's biological sex. Thus, for example, a biological woman's sex is female, and society would expect her gender to be feminine. *See* A. McGinley "Creating Masculine Identities: Bullying and Harassment 'Because of Sex'," 79 COLO. L. REV. 1151, 1153 (2008).

or lack of it, with the possible exception of "cornhole." On that word the record is unequivocal that its use toward Seehawer arose only after his error in the Vacuum Incident. The Supreme Court has "never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations. . . . [T]he conduct at issue [must not be] merely tinged with offensive sexual connotations, but actually constitute[] *discrimina[tion]* . . . because of . . . sex." *Oncale*, 523 U.S. at 80-81. Here, Seehawer's evidence does not create a reasonable inference under that standard as it applies to gender stereotyping.

> 4. "Because of sex": bullying.

At oral argument Seehawer asserted that the record supports a reasonable inference his coworkers bullied him "because of sex," perhaps because that they did not consider him "manly" enough. Although the conduct Seehawer alleges here lacks the sexual focus present in *Oncale* and *Nichols*, "bullying" conduct that is not facially sex-specific may violate Title VII. *EEOC v. National Educ. Ass'n, Alaska*, 422 F.3d 840, 842 (9th Cir. 2005). *Accord, Froby v. Clark Country School District*, 669 Fed. Appx. 903, 904 (9th Cir. 2016) (citing *National Educ. Ass'n* and *Oncale*). Thus, where a male supervisor frequently engaged in "shouting in a loud and hostile manner," used profanity, and displayed a physically intimidating demeanor toward female employees but not male employees, such conduct arguably occurred "because of sex" for Title VII purposes. *National Educ. Ass'n, Alaska*, 422 F.3d at 844 ("The facts in the record, interpreted in the light most favorable to the plaintiffs, could lead a reasonable juror to conclude that Harvey's conduct, of which primarily women were the targets, was 'because of . . . sex' within the meaning of the statute."). As the Ninth Circuit explained:

> [A] pattern of abuse in the workplace directed at women, whether or not it is motivated by "lust" or by a desire to drive women out of the organization, can violate

Title VII. Indeed, this case illustrates an alternative motivational theory in which an abusive bully takes advantage of a traditionally female workplace because he is more comfortable when bullying women than when bullying men. There is no logical reason why such a motive is any less because of sex than a motive involving sexual frustration, desire, or simply a motive to exclude or expel women from the workplace.

*Id.* at 845.

As discussed previously, *Oncale* and *Nichols* make clear that Title VII's "because of sex" prohibition extends to same-sex harassment, and *National Educ. Ass'n, Alaska* recognized that bullying behavior also can violate Title VII where an individual's behavior is directed primarily at the opposite sex. Unclear is whether the Supreme Court or the Ninth Circuit would extend Title VII to same-sex bullying that occurs in a same-sex workplace. What is clear, however, is that in each case in which harassing conduct has been found actionable under Title VII, the common factor is evidence of conduct that occurred "because of sex." It is the "because of sex" element that distinguishes Seehawer's situation from the cases discussed above and precludes this court from fitting his bullying theory into Title VII's prohibition. The record, including Seehawer's own testimony, confirms that Seehawer's problems with his co-workers began after his on-the-job error caused the Vacuum Incident.

Critically lacking here is evidence that Seehawer's coworkers' conduct contained a sexual component. In the cases where Title VII's "because of sex" requirement is met, the offensive physical or verbal behavior evinces a decidedly sexual focus. *See, e.g., Rene*, 305 F.3d at 1064 (coworkers told plaintiff "crude jokes," gave him "sexually oriented 'joke' gifts," and "grabbed him in the crotch and poked their fingers in his anus through his clothing"); *National Educ. Ass'n, Alaska*, 422 F.3d at 845 (male supervisor directed his "pattern of abuse" at women, thus supporting "because of sex" inference and creating fact question on plaintiffs' Title VII hostile work

PAGE 18 - OPINION AND ORDER

environment claim). The Vacuum Incident itself solely concerned an on-the-job mistake; it involved no sexual acts or words and did not occur in a sexual context. Following the Vacuum Incident, Seehawer's coworkers subjected him to insults, name-calling, and occasional non-contact physical intimidation – all of which, according to Seehawer, began and continued because of the Vacuum Incident. And after that incident, "cornhole," the only potentially sexually oriented word Seehawer says his coworkers used, was never used in a sexual context or accompanied by sexually focused conduct. Finally, Seehawer worked nine years for MWL before the Vacuum Incident occurred, and he makes no allegation that during he experienced bullying behavior or other offensive conduct. There is no fact in the record to support a reasonable inference that Seehawer's coworkers bullied him "because of sex."

Furthermore, applying Title VII's protection to facts such as those present here would read out of the statute the "because of sex" element. Bullying is not necessarily based on sex. *See American Heritage Dictionary of the English Language* 245 (5th ed. 2011) (defining "bully" as "A person who is habitually cruel or overbearing, especially to smaller or weaker people."); *Merriam-Webster Online Dictionary* (defining "bully" as "one who is habitually cruel, insulting, or threatening to others who are weaker, smaller, or in some way vulnerable."). Fitting into the "because of sex" prohibition conduct such as that alleged here, without evidence such as that present in *National Educ. Ass'n*, would convert every instance of mean, spiteful, or intimidating workplace conduct into a Title VII claim. As *Froby* makes clear, the statute's protection does not extend so far.

In sum, the record does not support a reasonable inference that the harassment of which Seehawer complains was "because of sex." Accordingly, his hostile work environment claim is

dismissed.[6]

       *B.     Retaliation.*

       Seehawer alleges that MWL retaliated against him for reporting and or opposing his coworkers' "because-of-sex" harassing conduct.  To prevail on a claim of unlawful retaliation, the plaintiff must prove (1) that he engaged in protected activity; (2) that he was subjected to an adverse employment action; and, (3) that the adverse employment action was causally connected to the protected activity.  *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464–1465 (9th Cir. 1994). "Making a formal or informal complaint of discriminatory treatment constitutes protected activity for purposes of Title VII retaliation." *Jernigan v. Alderwoods Grp., Inc.*, 489 F. Supp. 2d 1180, 1200 (D. Or. 2007) (citing *Ray v. Henderson*, 217 F. 3d 1234, 1240 (9th Cir. 2000).  However, Title VII protects employees from retaliation only for complaining about the types of discrimination it prohibits.  *Harris v. Treasure Canyon Calcuim Co.*, 132 F. Supp. 3d 1228, 1246 (D. Idaho 2015).

       Once a plaintiff makes such a showing, the burden then shifts to the employer to demonstrate that it had a legitimate, non-retaliatory reason for the adverse action.  *Id.*  The Plaintiff then has the "ultimate burden" of showing that the employer's "proffered reasons are pretextual." *Id.*

       The record does not support a reasonable inference of retaliation for complaining of sex-based harassment.  First, while on medical leave in February 2015, Seehawer submitted the Letter to management.  The seven-page, single-spaced, hand-written document begins by noting that "[t]his all started" with the Vacuum Incident.  Seehawer then describes coworker behavior toward him that is rude, intimidating, hostile, ostracizing, and dismissive.  Within those seven pages only one

---

     [6] Because the court finds that no question of fact exists that the complained-of conduct occurred "because of sex," the court does not address the "severe or pervasive" prong of Seehawer's hostile work environment claim.

paragraph on page three and part of a sentence on page four mention the corn-hole name-calling behavior. Neither of those two references contain or are coupled with descriptions of sex-focused behavior or words.

Second, Seehawer claims specifically that MWL "discriminated against [him] in the terms and conditions of his employment" when it "[1] failed to stop the harassing behavior, [2] asked [him] to meet with the harassing co-workers[,] and . . . [3] terminated his employment." (Compl. ¶ 31; Resp., at 15.) An adverse employment action is a "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998). An action is "cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Roth v. Cnty. of Maricopa*, 461 F. App'x 589, 590 (9th Cir. 2011).

Of the three actions Seehawer identifies, only his termination constitutes "a significant change in employment status," but he fails to show the requisite causal connection between his purported protected activity and the termination. Seehawer attributes his termination to his reporting or opposing harassment by his coworkers, but he overlooks MWL's undisputed willingness to reinstate him to his job at the conclusion of his FMLA leave – and his own testimony that he understood his employment would be terminated if he failed to return to work after FMLA leave; he hoped, instead, MWL would "offer [him] something else." (Seehawer Dep., 23 1:8–23; 233:4–21.). Seehawer was terminated only after, and because, he failed to return to his job.

The record does not support a reasonable inference that MWL terminated Seehawer in retaliation for engaging in protected activity, and summary judgment is granted on Seehawer's Title

VII retaliation claim.

II.    FMLA Interference, Discrimination, or Retaliation

Seehawer asserts that MWL "denied, interfered with, discriminated, and/or retaliated against" him for using protected leave under the FMLA. (Compl. ¶ 38.) Despite the assertion at oral argument that the claim was one of retaliation or discrimination (Compl. ¶¶ 18–22.), based on the allegations and facts, Seehawer's arguments are best understood as an interference claim.

"The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. Am. W. Airlines*, 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. §§ 2612(a), 2614(a)). The FMLA permits an eligible employee to take up to twelve weeks of unpaid leave during a twelve-month period to care for the employee's own serious health condition. 29 U.S.C. § 2611(2)(A)(I). Upon returning from FMLA leave, the employee has the right to be restored to his original position or to an equivalent position. 29 U.S.C. §§ 2612(a), 2614(a).

The Ninth Circuit recognizes three distinct types of claims under the FMLA: "(1) [§ 2615(a)(1)] interference claims, when an employer interferes with an employee's exercise of rights under the FMLA; (2) [§ 2615(b)] retaliation claims, when an employer discriminates against an employee *for* instituting or *participating in proceedings or inquiries* under FMLA; and (3) [§ 2615(a)(2)] discrimination claims, when an employer discriminates against an employee *for opposing any practice prohibited* by the FMLA." *Benz v. West Linn Paper Co.*, 803 F. Supp. 2d 1231, 1249 (D. Or. 2011) (internal citations omitted)(emphasis added). "By their plain meaning, the anti-retaliation [§ 2615(b)] or anti-discrimination [§ 2615(a)(2)] provisions do not cover" subjecting

an employee to "negative consequences . . . simply because he has *used* FMLA leave." *Bachelder*, 259 F.3d at 1124. "Such action is, instead, covered under § 2615(a)(1), the provision governing '[i]nterference [with the e]xercise of rights.'" *Id.*

To prevail on the interference FMLA claim, Seehawer "must prove, as a threshold matter, that [the] employer violated [FMLA] by interfering with, restraining, or denying" his exercise of FMLA rights. *Benz*, 803 F. Supp. 2d at 1250. Under the FMLA, an employee returning to work is entitled only to "the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay and other terms and conditions of employment." 29 C.F.R. § 825.214. Because "Congress wanted to ensure that employees' [rights] did not unduly infringe on employers' needs to operate their businesses efficiently and profitably," *Bachelder*, 259 F.3d at 1120, the FMLA does not entitle the employee to any rights to which he would not have been entitled had he not taken leave. 29 U.S.C. § 2614(a)(3)(B). The "right to reinstatement" is conditioned upon "an expectation that an employee will return to work after the [FMLA] leave ends." *Sanders v. City of Newport*, 657 F. 3d 772, 778 (2011).

It is undisputed that Seehawer requested, and MWL granted him, FMLA leave on December 12, 2014, so that Seehawer could seek treatment for anxiety and depression. MWL met its statutory obligations by granting Seehawer's FMLA request, and by allowing him to take the full time allotted under FMLA. MWL did not deny or restrain his use of FMLA. Moreover, Seehawer never "participated in proceedings or inquiries," nor did he oppose any act unlawful under FMLA prior to his termination. Therefore, MWL, did not deny, restrain, discriminate, or retaliate against Seehawer under FMLA.

The remaining possible violation implicated by Seehawer's allegations is interference with

a right granted by FMLA, namely, reinstatement. Seehawer knew that his FMLA leave was scheduled to end on April 23, 2015, and he remained on FMLA leave until that date. During the entirety of that leave, MWL held Seehawer's position open for him; MWL did not announce the position as vacant or filled by someone else. On April 23, 2015, Seehawer reported to MWL but he did not "work." Instead, he turned-in his keys and picked-up his personal belongings.

The record shows MWL was prepared to reinstate Seehawer to the same position that he held when his FMLA leave commenced, thereby meeting its reinstatement obligation under the FMLA. Seehawer asserts he "was not reinstated," for reasons "directly related to conduct associated with his FMLA leave." (Resp., 17.) Under *Sanders*, Seehawer's reinstatement right was conditioned upon his returning to work. MWL offered Seehawer reinstatement and Seehawer rejected it. As such, Seehawer fails to show any genuine issue of material fact related to the causal relationship between his termination and interference with his right to return to work.

Finally, Seehawer equates MWL's decision to decline his request for a different position with discrimination or retaliation for "complaining." (Seehawer Dep. 244:19–245:17.) The FMLA, however, does not create new job -related rights; it preserves only those rights the employee would have retained had the employee not taken leave. Under FMLA, MWL had no obligation to transfer Seehawer to another position, but only to restore him to his previous position if it remained available. It did remain available and MWL offered it to Seehawer. The FMLA did not obligate MWL to find a different position for Seehawer merely because he did not want to return to the position he held prior to taking FMLA leave.

MWL's motion for summary judgment on Seehawer's FMLA claim therefore is.

\ \ \ \ \

III.    ADA Claim

Finally, Seehawer alleges that MWL violated the ADA, first by failing to provide reasonable accommodation, and second by wrongfully terminating his employment because of his request for reasonable accommodation.

To prevail on a claim for wrongful termination under the ADA, Seehawer must establish: (1) that he was disabled within the meaning of the ADA; (2) that he was a qualified individual with a disability; and (3) that he was discriminated against because of his disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). Often a claim for failure to accommodate and a claim for wrongful termination due to an employee's disability are "from a practical standpoint, the same," because "the consequence of the failure to accommodate is . . . frequently an unlawful termination." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001). *See also Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (employer's failure to engage in the interactive process is a violation of the ADA, so long as a reasonable accommodation would have been possible). "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." *Id.* at 1140.

Although MWL disputes that Seehawer met the ADA's "qualified individual with a disability" requirement, there is a question of fact whether Seehawer was "disabled" within the meaning of the Act and, thus, a "qualified individual with a disability." The record demonstrates that Seehawer asked MWL for FMLA leave to allow him to address depression and anxiety. MWL thus knew of his condition, conditions which arguably qualify for protection under the ADA.

Furthermore, instead of engaging Seehawer in the interactive process, MWL merely informed

him that he could return to his previous position, which would require him to work with and around the same coworkers whose conduct gave rise to his condition. "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey*, 239 F.3d at 1137 (citation omitted). MWL made no effort to meet with Seehawer to discuss his condition and his requests for an accommodation that would allow him to return to his position. MWL presented no evidence that Seehawer's suggested accommodations would have imposed an undue harship or otherwise would not been reasonable under the ADA. *Humphrey*, 239 F.3d at 1133; 42 U.S.C. § 12112(b)(5)(A). Accordingly, summary judgment on this part of Seehawer's ADA claim should be denied. *See* " *Snapp*, 889 F.3d at 1095 ("[I]f an employer fails to engage in good faith in the interactive process, the burden at the summary-judgment phase shifts to the employer to prove the unavailability of a reasonable accommodation"); *Barnett v. U.S. Air, Inc.*, 226 F.3d 1105, 1116 (9th Cir. 2000) ("We further hold that an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process."), *rev'd on other grounds, U.S. Airways v. Barnett*, 535 U.S. 391 (2002) (reversing court of appeals and vacating judgment because of collective bargaining agreement issues).

Similarly, a question of fact exists whether MWL ended Seehawer's employment because of an actual or perceived disability. MWL knew that Seehawer had taken medical leave in October 2014, December 2014, and February 2015 to address stress, depression and anxiety. In April 2015, MWL sent a letter to Seehawer informing him that his employment had been terminated. The closeness of Seehawer's termination to his protected leaves to address an arguably disabling

condition is sufficient to raise a question of fact of a causal link. *See Bell v. Clackamas County*, 341 F.3d 858, 865-66 (9th Cir. 2003)(holding that proximity in time may by itself constitute circumstantial evidence of retaliation); *Pardi v. Kasier Foundation Hospitals*, 389 F.3d 840, 850 (9th Cir. 2004) (in ADA case, temporal proximity between plaintiff's protected activities and employer's adverse acts sufficiently raises an inference of a causal link).

Because a genuine issue of material fact exists as to whether MWL engaged in an interactive process as required by the ADA which resulted in Seehawer's termination, MWL's motion for summary judgement on the ADA claim is denied.

*Conclusion*

For the reasons explained above, Seehawer fails to show any genuine issue of material fact as to his Title VII claims or his FMLA claim, but issues of material fact exist as to his ADA claims. Accordingly, MWL's Motion (ECF No. 29) for Summary Judgment is GRANTED as to his Title VII and FMLA claims, and DENIED as to his ADA claims.

DATED this 15th day of March, 2019.

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 27 - OPINION AND ORDER